IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA FISCHER, | : | No. 4:07-CV-1653 |
| | : | |
| Plaintiff, | : | |
| | : | Judge John E. Jones III |
| v. | : | |
| | : | (Magistrate Judge Smyser) |
| PENNSYLVANIA STATE POLICE, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### March 10, 2009

This matter is before the Court on the Report and Recommendation

("R&R") of Magistrate Judge J. Andrew Smyser (Rec. Doc. 49) which

recommends that the Motion for Summary Judgment filed by Defendant

Pennsylvania State Police ("PSP") (Rec. Doc. 13) be granted.  No objections to the

R&R have been filed.[1]  For the reasons set forth below, the Court will adopt the

R&R.

## I.    STANDARD OF REVIEW

When, as here, no objections are made to a magistrate judge's report and

recommendation, the district court is not statutorily required to review the report

---

[1] Objections were due by March 9, 2009.  To this date, none have been filed.

before accepting it. <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985).  According to the

Third Circuit, however, "the better practice is to afford some level of review to

dispositive legal issues raised by the report." <u>Henderson v. Carlson</u>, 812 F.2d 874,

878 (3d Cir. 1987).  "[T]he court need only satisfy itself that there is no clear error

on the face of the record in order to accept the recommendation." Fed. R. Civ. P.

72(b), advisory committee notes; <u>see also Henderson</u>, 812 F.2d at 878-79 (stating

"the failure of a party to object to a magistrate's legal conclusions may result in the

loss of the right to de novo review in the district court"); <u>Tice v. Wilson</u>, 425 F.

Supp. 2d 676, 680 (W.D. Pa. 2006); <u>Cruz v. Chater,</u> 990 F. Supp. 375-78 (M.D. Pa.

1998); <u>Oldrati v. Apfel</u>, 33 F. Supp. 2d 397, 399 (E.D. Pa. 1998).  The Court's

examination of this case confirms the Magistrate Judge's determinations.

## II.   BACKGROUND

Plaintiff Sandra Fischer, a former PSP Trooper, filed a *pro se* Complaint

against the PSP lodging claims that emanated from her employment at the PSP and

her subsequent discharge therefrom.  Defendant PSP filed the instant Motion for

Summary Judgment on August 27, 2008. (Rec. Doc. 18).  Through an exhaustive

and well-reasoned R&R dated February 18, 2009, Magistrate Judge Smyser

recommended that we grant the Motion for Summary Judgment.

As we have already mentioned, the Plaintiff has failed to file objections to this R&R.  Because we agree with the sound reasoning that led the Magistrate Judge to the conclusions in the R&R, we will adopt the R&R in its entirety.  With a mind towards conserving judicial resources, we will not rehash the reasoning of the Magistrate Judge; rather, we will attach a copy of the R&R to this document, as it accurately reflects our consideration and resolution of the case sub judice. An appropriate order will enter.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA FISCHER, | : | **CIVIL NO.  4:07-CV-1653** |
| | : | |
| Plaintiff | : | (Judge Jones) |
| v. | : | |
| | : | (Magistrate Judge Smyser) |
| PENNSYLVANIA STATE POLICE, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

This is an 42 U.S.C. Section 2000 *et seq.* employment discrimination case and the court has federal question jurisdiction, 28 U.S.C. Sections 1331, 1343.  The plaintiff is Sandra Fischer, who is a former Pennsylvania State Police Trooper.  The defendant is the Pennsylvania State Police, a department of the Commonwealth of Pennsylvania.  In a complaint filed on September 7, 2007, the plaintiff claims that she suffered discrimination on the basis of her female gender and that she suffered retaliation and harassment because she filed an Equal Employment Opportunity complaint and because of her gender.  She also claims that she was constructively discharged as a member of the Pennsylvania State Police by the hostile workplace in which she was made to work, and that the defendant violated the Pennsylvania Human Relations Act and committed the Pennsylvania law tort of an intentional infliction of emotional distress against her.

She alleges that she was more successful and more adept at her position than her male colleagues and that she was subjected to a different standard of discipline and to harassment resulting from the jealousy and resentment of her colleagues and of her supervisors.  She alleges that there were vindictive distortions of her work statistics, and that she was treated differently because of her normal, cultural and natural female characteristics.  She asserts that she was subjected to a different regimen of supervisory interaction of a decidedly negative and demeaning manner and was ridiculed by her employer's management personnel and that there was an unlawful conspiracy to punish her because of her female sex.  She alleges that her supervisors engaged in a practice of intentional harassment to inflict emotional upset and distress upon her, including trying to imply that she was mentally ill, eventually driving her from her employment and causing her constructive discharge.  She states a claim under Title VII, 42 U.S.C. Section 2000 *et seq.* and a claim under the Pennsylvania Human Relations Act.

An answer to the complaint was filed on April 16, 2008. (Doc. 12).  The discovery deadline was July 31, 2008.  A motion for summary judgment was filed by the defendant on August 27, 12008.  (Doc. 18).  A supporting brief, supporting affidavits, declarations, depositions and documents and a LR 56.1 statement of facts were filed.

2

(Docs. 27, 28, 29, 30).  The plaintiff's brief, LR 56.1
statement of facts, evidentiary materials and brief were
filed on October 3, 2008. (Docs. 35 and 36).  The defendant
filed a reply brief on November 24, 2008.  (Doc. 44).

The defendant presents as arguments in its summary
judgment motion that it is entitled to judgment because all
of the plaintiff's claims are foreclosed by *res judicata*.
The defendant argues in the alternative that it is entitled
to summary judgment as to the plaintiff's gender
discrimination claim, that it is entitled to summary
judgment as to the plaintiff's retaliation claim, that it is
entitled to summary judgment as to the plaintiff's
constructive discharge claim and that it is entitled to
summary judgment as to the plaintiff' state law claims in
that there is not a genuine dispute as to a material issue
of fact and in that the defendant is entitled to a judgment
as a matter of law as to each of these claims.  We agree for
the following reasons that the defendant is entitled to
summary judgment.

Summary judgment is appropriate if the "pleadings, the
discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as
a matter of law."  Fed.R.Civ.P. 56(c).  The moving party

3

bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'-- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Summary judgment is not appropriate when there is a genuine dispute about a material fact. *Id.* at 248. An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving

4

party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial. *Anderson, supra*, 477 U.S. at 249. The proper inquiry of the court in connection with a motion for summary judgement "is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

Proceeding under LR 56.1, the parties in this case filed comprehensive LR 56.1 statements. By the use of the contents of these statements in combination with the related Rule 56(c) affidavits, declarations, depositions and documents, we will proceed to determine the facts that are genuinely not in dispute.[1]

It is not in dispute that in the complaint in this matter, Fischer asserts that her supervisors treated her differently because of her gender and that she was retaliated against for filing an internal Equal Employment Opportunity complaint. She asserts that she was "treated to

---

[1] Not all of the undisputed facts set forth here are necessarily material.

6

different standards of discipline and consistently
harassed," and that she "suffered vindictive distortions of
her work statistics," because of her gender.  She asserts
that her supervisors "ridiculed [her] and subjected her to a
different regimen of supervisory interaction of a decidedly
negative and demeaning nature" and that they "tr[ied] to
imply that she was mentally ill."  She also claims that she
was constructively discharged.

Plaintiff Fischer was also previously the plaintiff in
another federal lawsuit based on her employment with the
Pennsylvania State Police, although she brought claims in
that case pursuant to 42 U.S.C. § 1983, rather than Title
VII, in her first lawsuit.  In that case, the defendants
were individual Pennsylvania State Police officers.  In the
complaint in her first lawsuit, Fischer claimed that her
supervisor, Corporal Joseph Wolinsky, a defendant in that
case, improperly altered her arrest statistics in an effort
to discredit her and to diminish her professional standing
with the Pennsylvania State Police and that, after she
complained to Lieutenant Mark Schau in May 2003 about
Corporal Wolinsky's altering her arrest statistics, Corporal
Wolinsky began issuing more Report Correction Notices to
her.  She further claimed that after she had complained of
unequal treatment, she was improperly subjected to three
internal investigations and was ordered to undergo an

Independent Psychiatric Evaluation. Summary judgment has
been granted in favor of all defendants on all claims in
*Fischer v. Transue, et al.,* No. 1:04-CV-2756.

On January 25, 2004, Fischer filed her first and only
charge against the Pennsylvania State Police with the
Pennsylvania Human Relations Commission. In her charge, she
asserted the gender discrimination and retaliation claims
she brings in this lawsuit, but did not assert a
constructive discharge claim.  She never filed a charge
before either the Pennsylvania Human Relations Commission
or the Equal Employment Opportunity in which she asserted a
constructive discharge claim.

Fischer complains in this complaint about the manner in
which Corporal Wolinsky reported her arrest statistics to
Pennsylvania State Police Headquarters, that Corporal
Wolinsky ridiculed her, and that Corporal Wolinsky
"subjected her to a different regiment of supervisory
interaction of a decidedly negative and demeaning nature."
She alleges that in December 2002 and for several months
prior, Corporal Wolinsky credited her with fewer arrests
than she had actually made in the monthly statistics that he
reported to Pennsylvania State Police Headquarters.

It is not in dispute that Corporal Wolinsky kept a log
of all arrests made by the troopers in the Crime Unit at
Mercer.  He logged an arrest in this log on the date that he
received the investigative report from the trooper, not on
the date the actual arrest occurred.  This allowed Corporal
Wolinsky to ensure that all of the arrests that he reported
on his monthly report were supported by appropriate
documentation.  Corporal Wolinsky logged the arrests of all
officers that he supervised in his position as the Crime
Unit supervisor at Mercer, as well as in the supervisory
positions that he held both before and since he was the
Crime Unit supervisor at Mercer, in this way.  He has never
intentionally varied from this method of recording arrests.

According to Corporal Wolinsky, he logged arrests on
the date that he received an investigative report from the
trooper, not on the date that the actual arrest occurred, so
as to assure that all arrests that he reported on his
monthly report were supported by the appropriate
documentation.  He logged the arrests of all officers who he
supervised in his position as the Crime Unit Supervisor at
Mercer, as well as in the supervisory position he held, both
before and after his position at Mercer, in this same way.
He never varied from his method of reporting arrests.

According to plaintiff Fischer, her arrest reports were not accurately recorded and her arrests were not reflected on Wolinsky's report.  Troopers are required to submit reports, called "10-day dailies," three times per month, reporting, inter alia, the number of arrests that they made.

Corporal Wolinsky has testified that there were often discrepancies between the number of arrests reported by plaintiff Fischer and her ten-day dailies and the number of arrests that Corporal Wolinsky had noted for the plaintiff in his log book due to his practice of not logging an arrest until he had received a report.  He has testified that neither raises nor promotions are based upon these statistics.  There is no evidence in the record that Corporal Wolinsky reported the arrest statistics of plaintiff  Fischer's male co-workers in a different fashion from how he reported her arrest statistics.

Plaintiff Fischer believes that Corporal Wolinsky altered her arrest statistics because she had so many more arrests than the other members of the crime unit.

Plaintiff Fischer asserts that Corporal Wolinsky ridiculed her.  She asserts that on one occasion, Corporal Wolinsky made the statement, "At least I don't look like a fat pig in uniform," to another co-worker and gestured

toward Fischer, who was sitting in the same room.  At the
time, Fischer was unaware that the comment was directed at
her.  She states that she was later told that this was the
case by the co-worker to whom Corporal Wolinsky was
speaking.  There is no affidavit or deposition of this co-
worker.  Corporal Wolinsky once yelled at the plaintiff,
"How goddam stupid are you?  Can't you understand English?"

Corporal Wolinsky allegedly criticized Fischer's manner
of dress, specifically that she wore tennis shoes when she
injured her foot.  Fischer cited no instances where male
troopers wore tennis shoes or dressed differently to
accommodate an injury.  There is no evidence in the record
that Fischer was treated differently from her male
co-workers in this regard.

Corporal Wolinsky never made any comments regarding
Fischer's gender to her or anyone else.

Fischer maintains that Corporal Wolinsky "subjected her
to a different regimen of supervisory interaction of a
decidedly negative and demeaning nature."  She claims that
she usually was not kept abreast of case developments or
training opportunities.  She testified that, in the crime
unit at Mercer, "[i]nformation was not being distributed in
the crime unit as is customary in crime units."  She

testified that, in the two other crime units to which she was assigned, there was some sort of group briefings on case developments. She claims that Corporal Wolinsky questioned her about how she was handling her investigations, when he did not question other members of the crime unit, and that Corporal Wolinsky interfered with her investigations and "wouldn't let [her] do things the way [she] wanted."

The evidence does not include evidence that Corporal Wolinsky's questioning of the plaintiff was based on Fischer's gender. There is a lot of evidence that Fischer and Corporal Wolinsky had repeated differences of opinion about the appropriate manner in which to handle investigations. According to Fischer, "Corporal Wolinsky didn't always understand how [she] did [her] investigations or why [she does] what [she does] or whatever. But [she] had a different approach from most people there." She "would try to explain things and there was very poor communication between [Fischer] and Corporal Wolinsky." She "would try and explain things about why [she did] what [she] did, and he would try to explain why he wanted me to do it another way." She thought that Corporal Wolinsky "would try and direct [her] to go interview people that were irrelevant to an investigation." When she expressed her disagreement with the way in which Corporal Wolinsky directed her to conduct investigations and complete reports to Sergeant Randy

Anderson and Corporal Kirt Snyder, she was instructed by
both of them that she needed to comply with Corporal
Wolinsky's instructions because he was her supervisor.  The
summary judgment evidence reasonably supports the inference
that the plaintiff did not accept that reason as adequate.

With respect to investigations regarding bad checks,
Corporal Wolinsky wanted the plaintiff to include additional
information that she deemed irrelevant.  She refused and
continued to include only the information she deemed
relevant.  Corporal Wolinsky wanted her to close out some of
her cases and, according to Fischer, "he failed to
understand why [she] just would not close cases out."  She
thought that what Corporal Wolinsky wanted her to do "wasn't
good police work," and she refused to close cases out as he
instructed because she "had to do what [she] was comfortable
with."

There is no evidence in the record that Corporal
Wolinsky had different requirements for Fischer than he did
for the male officers in the crime unit.  The plaintiff,
however, reports based upon her observations that male
troopers were more often informed of training opportunities
than was she.

13

Fischer filed an internal Equal Employment Opportunity complaint on October 14, 2003.  She claims that she suffered retaliation for the filing of this complaint.  She complains that Corporal Wolinsky "interfered with her reports" by issuing more Report Correction Notices to her following her Equal Employment Opportunity complaint.  She complains that she "was treated to different standards of discipline" when she was the subject of several internal investigations.  She claims that her supervisors "tr[ied] to imply that she was mentally ill" by referring her for an Independent Psychiatric Examination.

Subsequent to her filing the internal Equal Employment Opportunity complaint, Fischer alleges that the number of Report Correction Notices she received from Corporal Wolinsky increased.  She transferred to the Crime Unit at Mercer in January 1999.

Corporal Wolinsky was dissatisfied with the quality of the plaintiff's reports from the outset of her assignment to the Crime Unit.  He considered her reports to lack adequate specificity, no to be clear and concise and containing spelling errors.

The plaintiff believes that there was not as great a degree of dissatisfaction with her reports at the outset as

14

later on.  She asserts that dissatisfaction increased after
she filed a complaint with the Equal Employment Opportunity
Commission.  She does agree that Corporal Wolinsky did bring
her deficiencies to her attention.  Corporal Wolinsky
declares that he reviewed the plaintiff's reports no
differently from other troopers' reports.  The plaintiff
disputes this, but cites no evidentiary basis for the
dispute.  Many of the plaintiff's factual contentions are
presented as unsupported generalizations.

The three months preceding the internal Equal
Employment Opportunity complaint (July-September 2003),
Corporal Wolinsky issued six Report Correction Notices to
Fischer: one on September 5, 2003, four on September 6,
2003, and one on September 19, 2003.  On September 19, 2003,
Corporal Wolinsky conducted Fischer's semi-annual progress
review.  In that review, Corporal Wolinsky noted continuing
problems with the reports Fischer was submitting.  Following
the filing of the internal Equal Employment Opportunity
complaint, between October 15, 2003 and January 31, 2004,
Corporal Wolinsky issued five Report Correction Notices to
Fischer: one on October 23, 2004, one on October 27, 2004,
and three on December 4, 2003.  Additionally, on October 23,
2003, Lieutenant Thomas Hill also issued a Report Correction
Notice to Fischer.

Fischer admits that the "vast majority" of the
discrepancy notices Corporal Wolinsky issued to her were
addressed to legitimate changes that needed to be made to
her reports, and that none of them directed her to make
changes to her reports that contravened Pennsylvania State
Police regulations.  After the filing of the internal Equal
Employment Opportunity complaint, Trooper Fischer was named
as the subject of three internal investigations in
retaliation for her complaint.  On November 4, 2003, Captain
Susan Bell and Major Terry Seilhamer saw photographs of
Fischer in a Pennsylvania State Police vehicle in wet
concrete.  On that same date, they learned that the concrete
incident had occurred on October 2, 2003.

The plaintiff asserts that Captain Bell had learned of
the concrete incident on October 16, 2003.  Reports about
the concrete incident had not been completed by the
plaintiff.  The plaintiff felt that no report was necessary.
Captain Bell initiated an investigation.  She determined
that appropriate reports had not been completed.  The
plaintiff asserts that the investigation was conducted in
retaliation against her for her initiation of an Equal
Employment Opportunity Commission action.  The plaintiff was
given a three day suspension for failing to submit the
required paperwork after the incident and for failing to
ensure that the vehicle was inspected for any mechanical or

16

other problems.  After Fischer filed a union grievance
regarding the three day suspension, it was reduced to a one
day suspension.

On November 12, 2003, Lieutenant Thomas Hill informed
Captain Bell that Fischer had failed to activate the Major
Case Team in response to a homicide that occurred on
November 10, 2003.  It is standard protocol to activate the
Major Case Team for all homicides.  Troop D Special Order
95-22, Major Case Team Special Order 2003-20, and the Mercer
Station Commander's August 16, 2003 memorandum on Duty
Assignment and Responsibilities all require notification of
the District Attorney, the Mercer Station Commander and the
supervisors of the Major Case Team in all homicides.
Captain Bell initiated an internal investigation into the
incident.  The plaintiff asserts that the investigation was
retaliatory for the Equal Employment Opportunity Commission
complaint.  The plaintiff's failure to activate the Major
Case Team for a homicide was a clear violation of several
Pennsylvania State Police field regulations.  When the
violation of the Pennsylvania State Police Field Regulations
was reported to Captain Bell, she was obligated by those
regulations to initiate an investigation.  As the Troop
Commander, she had a concern about this deficiency in the
Troop and wanted to ensure that it did not happen again.
Fischer received a written reprimand for this incident.

17

On March 10, 2004, Brandt Collins called the Mercer barracks to complain about Fischer's handling of a criminal investigation in which he was victim. Lieutenant Schau spoke to Mr. Collins about his complaint. Mr. Collins alleged that Fischer failed to complete the investigation in a timely and competent manner, and that she showed favoritism to the accused, his girlfriend. Mr. Collins also alleged that Fischer had made negative comments about her fellow officers and supervisor. Lieutenant Schau initiated an internal investigation into Mr. Collins' allegations. Captain Bell adjudicated IAD 2004-0235. Captain Bell did not sustain Mr. Collins' allegations against Fischer regarding the handling of the criminal investigation and showing favoritism to his girlfriend, and Fischer received no formal discipline. Captain Bell also did not sustain Mr. Collins' allegations that Fischer made negative comments about her fellow officers and supervisor, but cautioned Fischer to "refrain from openly criticizing [her] co-workers and making disparaging remarks."

On February 6, 2004, Lieutenant Schau received a complaint from a victim, Daniel Taylor, regarding Fischer's handling of a criminal investigation. Lieutenant Schau handled Mr. Taylor's complaint as a Supervisor's Notation rather than by initiating an internal investigation.

Fischer also claims that her supervisors referred her for an Independent Psychiatric Examination in retaliation for her internal Equal Employment Opportunity complaint.  In the months leading up to November 2003, Lieutenant Schau noted that Fischer was becoming increasingly emotional and distraught at work, and that her mental state was negatively affecting her work.  On November 12, 2003, Lieutenant Schau referred her to the Member Assistance Program.  Fischer met with a peer contact on November 13, 2003.  She was emotionally distraught and broke down crying at work on at least one occasion.  Lieutenant Schau prepared a memorandum to Captain Bell detailing what he had observed.  In late 2003 and early 2004, Captain Bell received reports that Fischer was becoming increasingly emotional and distraught at work, and that her mental state was negatively affecting her work.  She received memoranda from Fischer's Station Commander, Lieutenant Schau, as well as two of Fischer's supervisors, Sergeant Anderson and Corporal Snyder, detailing her increasing emotional breakdowns at work. Additionally, because she initiated them, Captain Bell was aware that Fischer was the subject of Internal Affairs Division investigation 2003-0837 and Internal Affairs Division investigation 2003-0838, and she was aware of the factual allegations that formed the bases for these internal investigations.

19

Although Captain Bell did not observe Fischer on a
day-to-day basis because she was stationed at the Mercer
barracks and Captain Bell's office was at the Troop D
headquarters in Butler, the factual circumstances leading up
to Internal Affairs Division investigation 2003-0837 and
Internal Affairs Division investigation 2003-0838 caused
Captain Bell to question how Fischer was performing her job,
because Captain Bell considered it not to be usual for an
experienced officer to have these kinds of problems.
Captain Bell was also provided with a series of Supervisor's
Notations indicating that various supervisors had attempted
to address deficiencies in the manner in which the plaintiff
was performing her job and she was aware that the plaintiff
had filed an internal Equal Employment Opportunity complaint
against Corporal Wolinsky that had been determined to be
unfounded.  Captain Bell discussed this combination of
circumstances with both Major Seilhamer and a representative
from the Pennsylvania State Police's Bureau of Human
Resources and concluded that she needed to request that the
Human Resources Bureau refer Fischer for an Independent
Psychiatric Examination.  Fischer was referred for an
Independent Psychiatric Examination on April 16, 2004.  Dr.
Charles Berlin ultimately conducted the Independent
Psychiatric Examination on May 24, 2004, and found Fischer
fit for duty.  On December 19, 2005, Fischer was injured
while on duty and submitted a workers' compensation claim

report.  Fischer's workers' compensation claim was accepted
and she received compensation for her wages and coverage of
her medical expenses.

On June 12, 2006, the Pennsylvania State Police sent
Fischer for an Independent Medical Examination to be
conducted by Robert L. Waltrip, M.D.  Dr. Waltrip determined
that Fischer had fully recovered from her injury.

On June 19, 2006, Fischer advised the Pennsylvania
State Police that she was retiring on August 25, 2006.  On
June 20, 2006, Fischer's retirement was acknowledged and
accepted by the Pennsylvania State Police.  On June 20,
2006, Fischer was advised of Dr. Waltrip's findings and of
her ability to return to work.  Between December 20, 2005
and August 14, 2006, Fischer was on disability leave from
the Pennsylvania State Police and did not report to work.
On August 14, 2006, Captain Robert Lizik authored a
memorandum directing Fischer to return to work on August 19,
2006.  On August 15, 2006, the memorandum directing Fischer
to return to work was hand-delivered to her.  Fischer
remained on disability leave between August 14 and August
18, 2006.  She did not return to work on August 19, 2006,

and utilized sick leave between that date and August 25, 2006, her retirement date.[2]

* * *

The defendant argues initially that all of the plaintiff's claims should be dismissed on the basis of *res judicata* and claims preclusion.

*Res judicata* and claims preclusion are to be applied to bar the litigation of a claim when there has been a prior judgment on the merits, the party against whom the bar is applied is the same party as the party to the prior judgment, and the subsequent suit is based upon the same cause of action. *Wright, Miller and Cooper*, §§ 4401, *et seq.*

The was a final judgment in *Fischer v. Transue*, Civil Action 1:04-cv-2756. Plaintiff Fischer was the plaintiff in that earlier law suit. The earlier case stated claims

---

[2] In determining the material facts as to which there is no genuine dispute, derived from the parties' LR 56.1 statements (Docs. 27 and 35), this Report and Recommendation has set forth the substance of facts stated by the moving party and admitted by the non-moving party. Facts affirmatively stated by the non-moving party after admitting the moving party's factual assertion are not included as facts not in dispute. Where the non-moving party has denied a factual statement and has referred to evidence showing the factual proposition to be genuinely in dispute or has pointed to a meritorious evidentiary objection to the putative undisputed fact, the putative fact is not included here. Whether the non-moving party has stated "Denied" but has not set forth an evidence-based contrary factual assertion or a meritorious evidentiary objection, the moving party's factual statement is included.

against her supervising officers based upon incidents of her
supervision and based upon alleged retaliation by them
against her for having filed an Equal Employment Opportunity
complaint.

Where the elements of *res judicata* are present, a
plaintiff is barred from relitigating claims actually
decided <u>and</u> claims that the parties could have presented in
the prior action. *Id.*

In opposition to the defendant's *res judicata* argument,
the plaintiff asserts that she could not bring her Title VII
claim against the Department of the Pennsylvania State
Police until her Equal Employment Opportunity action was
completed, that her 42 U.S.C. § 1983 action in *Fischer v.*
*Transue* had to be brought when it was brought because the
statute of limitations was about to expire, and that the two
cases do not involve the same parties.

The complaint in *Fischer v. Transue* involved claims
based upon substantially the same incident(s) and upon
substantially similar theories as the present case.  Both of
these cases involve interactions and incidents arising from
the supervision of the plaintiff by her superior officer,
Corporal Wolinsky, in her assignment to the crime unit at
the Pennsylvania State Police Mercer Barracks.   The

23

plaintiff could have brought the claims in this case with her claims in that case, and could have sought a stay of the case until her administrative Equal Employment Opportunity and Pennsylvania Human Relations Act actions were complete. Nevertheless, the cases do not involve the same defendant(s). We do not, therefore, agree with the defendant that this complaint against the Pennsylvania State Police is barred as a matter of *res judicata* or claims preclusion, except as to the plaintiff's claim of retaliation discussed below.

Accordingly, it will be recommended that summary judgment in favor of the defendant and against the plaintiff on the basis of *res judicata* and claims preclusion not be granted.

We will go on to address the defendant's other summary judgment grounds and arguments.

Both the defendant and the plaintiff in their briefs frame and discuss the plaintiff's gender discrimination claim as a hostile work environment claim, i.e., that the plaintiff was subject to a hostile work environment because of her sex.

24

In order to prevail on her hostile work environment
claim, the plaintiff must establish (1) that she is a
qualified individual; (2) that she was subject to unwelcome
harassment; (3) that the harassment was based on her sex;
(4) that the harassment was sufficiently severe or pervasive
to alter the conditions of her employment and to create an
abusive working environment; and (5) that the defendant knew
or should have known of the harassment and failed to take
prompt effective remedial action. *Walton v. Mental Health
Assoc.*, 168 F.3d 661, 667 (3d Cir. 1999). "The analysis of
the hostile work environment claim has a subjective and an
objective component: the evidence must establish that the
environment would be perceived by a reasonable person as
hostile and that [the plaintiff] did, in fact, perceive it
to be so." *Martin v. Allegheny Airlines, Inc.*, 126
F.Supp.2d 809, 820 (M.D.Pa. 2000), *aff'd*, 261 F.3d 492 (3d
Cir. 2001). For harassment to be actionable it must be
sufficiently severe or pervasive to alter the conditions of
the plaintiff's employment and create an abusive working
environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67
(1986). The United States Supreme Court has "made it clear
that conduct must be extreme to amount to a change in the
terms and conditions of employment." *Faragher v. City of
Boca Raton*, 524 U.S. 775, 788 (1998). Whether an
environment is hostile or abusive can be determined only by
looking at all of the circumstances. *Harris v. Forklift*

*Systems, Inc.,* 510 U.S. 17, 23 (1993).  The circumstances
"may include the frequency of the discriminatory conduct;
its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work
performance." *Id.*

The plaintiff points to many incidents involving many
superior officers which she perceived to constitute
treatment of her that differed from the treatment she
perceived to have been accorded to her male counterparts.
Quite a few of the plaintiff's proffered points of evidence
in opposition to the summary judgment motion serve to
address the subjective component of the hostile work
environment cause of action; i.e., "I was made to feel like
a fifth wheel."  However, there is scant objective evidence
of a difference in treatment.  Looking at the summary
judgment evidence with an eye to the objective component,
many of the described incidents seem to be unremarkable and
not to support any inference of different treatment; i.e.,
the plaintiff was disciplined for driving her patrol car
into wet concrete and for not having the vehicle inspected
after that and for failing to follow her supervisors' orders
and department policies.  She describes many instances and
contexts in which, having decided that she knew better than

her superior officer how a task should be done, she followed
her own counsel and not her superiors' directives.

The plaintiff's brief in opposition to the defendant's
motion for summary judgment states feelings and perceptions
of the plaintiff and characterizations of her situation in
terms of generalized conclusions; i.e., "the only basis for
him [Wolinsky] wanting a male officer instead of the
plaintiff would have been because of her gender" and "[s]he
was obviously treated differently by Wolinsky than the males
within the Department." However, the summary judgment
evidence of the defendant in all instances presents
explanations for decisions and actions which explanations
are based upon colorably sensible departmental objectives.

There is summary judgment evidence that Corporal
Wolinsky spoke harsh and negative words used on one occasion
to criticize the plaintiff, but not words having any
reference to gender. It is in dispute whether things of
value were communicated to other troopers but were not
communicated to her on some occasions. And, although there
is evidence that some reports did not correctly state the
number of police actions that she had taken, there is an
explanation for the provided by the defendant that appears
to be very plausible and there is no showing by the
plaintiff of a basis to link the arguable reports issue to

27

harassment or as to harassment based on sex.  All of the
evidence in combination can not reasonably be seen to
support a reasonable inference that the plaintiff suffered
harassment or discrimination in her employment based upon
her sex.  The summary judgment evidence and the parties'
statements of facts and their briefs set forth a series of
incidents, disagreements and pointed discussions and
criticisms as between supervisor and supervised officer in
the situation of Corporal Wolinsky as supervising officer
and plaintiff Fischer as supervised officer.  All of the
disagreements concerned workplace matters, regimens,
occurrences and issues.  None of the comments involved
gender or sex references.  Plaintiff Fischer perceived there
to be erroneous facts and perceptions motivating Corporal
Wolinsky's decisions and assertions.  Corporal Wolinsky did
not perceive those decisions and assertions, to the extent
that he agrees that they were made, to have involved
erroneous facts or perceptions.

    There might be a material issue of fact genuinely in
dispute in this case if, as the plaintiff asserts, Corporal
Wolinsky had decided prior to the plaintiff's transfer to
the Mercer crimes unit that he did not want a woman for the
open position.  However, there is not evidence of this.  In
the plaintiff's summary judgment papers, the only putative
evidentiary reference to support this assertion is to the

plaintiff's own deposition, Doc. 36, Attach. 3, pages 139-140:

> Q.  On what do you base your belief that
> this treatment was related to your
> gender versus a personality conflict?
>
> A.  Because it started prior to him ever
> knowing me or working with me.  I mean,
> it started — goes all the way back when
> I first was told by Captain Simon that
> he was trying to block me taking the
> position.  I mean, I never worked with
> the man.  I couldn't even have told you
> his first name at the time.

A statement by (declarant) Captain Simon to the plaintiff describing something said or done by Corporal Wolinsky, proffered to prove the truth of the fact that Wolinsky did say or do what is being attributed to him by Simon, is plainly inadmissible hearsay.  Federal Rules of Evidence, Rules 801, *et seq*.  The plaintiff does not provide any summary judgment evidence that Corporal Wolinsky made such a statement.  Wolinsky was deposed.  He did not acknowledge having made such statements to Simon.  No affidavit or deposition of Simon is provided by the plaintiff in opposition to the summary judgment motion.[3]

The defendant's evidence demonstrates these material facts not to reasonably be in dispute: there were disagreements between Corporal Wolinsky and plaintiff

---

[3] Similarly, there is no showing made by the plaintiff that there is admissible evidence that Corporal Wolinsky made a derogatory comment about the plaintiff's appearance.

Fischer as to how the job to be done by Fischer was to be done, Corporal Wolinsky did not have different standards for Fischer than for other officers under the supervision of Corporal Wolinsky in the crime unit, and there was no dialogue relating to sex or gender.  The defendant's brief sets forth in detail the particular evidence supporting these material factual statements, and a review of the plaintiff's summary judgment brief, LR 56.1 statement and evidence reveals the absence of evidence to give rise to a genuine dispute as to any of the material issues of fact. It will be therefore recommended that the defendant's motion for summary judgment be granted as to the plaintiff's gender discrimination, hostile workplace claim.

The defendant has asserted that summary judgment as to the plaintiff's constructive discharge claim should be granted for the defendant because the trier of fact could not reasonably find that a reasonable person in the plaintiff's shoes would have felt compelled to resign. Since there is not evidence of pervasive or severe adverse treatment of the plaintiff based upon her sex, we agree. Summary judgment should not be granted in favor of the defendant as to the plaintiff's constructive discharge claim.

The claim of the plaintiff that she was subjected to
retaliation is subject to a claim preclusion analysis.   This
claim was litigated and decided in *Fischer v. Transue,* Civil
Action 1:04-cv-2756.   In a thorough and comprehensive
analysis considering there whether the defendants, including
Corporal Wolinsky, were entitled to summary judgement upon
plaintiff Fischer's claim of retaliation, the court found an
absence of a genuine dispute, based upon the summary
judgment evidence, as to whether there was a causative
relationship between the plaintiff's pursuit of claims
against her superior officers, on the one hand and, on the
other, later investigations of her employment conduct and a
later referral of her for a psychiatric evaluation.   These
claims have been decided, and are precluded from another
adjudication anew.

The state law claims of the plaintiff against the
Pennsylvania State Police are barred by sovereign immunity.
The claim of an intentional infliction of emotional distress
is not a claim as to which Pennsylvania has waived the
sovereign immunity of the Commonwealth and its agencies.

31

For the foregoing reasons, it is recommended that the
defendant's motion for summary judgment be granted.




**/s/ J. Andrew Smyser**
J. Andrew Smyser
Magistrate Judge


Dated:

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


SANDRA FISCHER,                    :    **CIVIL NO.  4:07-CV-1653**
                                   :
          Plaintiff               :    (Judge Jones)
     v.                            :
                                   :    (Magistrate Judge Smyser)
PENNSYLVANIA STATE POLICE,         :
                                   :
          Defendant               :


## NOTICE


     Any party may obtain a review of the Report and
Recommendation pursuant to Rule 72.3 of the Rules of Court,
M.D.Pa., which provides:

     Any party may object to a magistrate judge's proposed
     findings, recommendations or report  addressing a motion or
     matter described in 28 U.S.C. § 636(b)(1)(B) or making a
     recommendation for the disposition of a prisoner case or a
     habeas corpus petition within ten (10) days after being served
     with a copy thereof.  Such party shall file with the clerk of
     court, and serve on the magistrate judge and all parties,
     written objections which shall specifically identify the
     portions of the proposed findings, recommendations or report to
     which objection is made and the basis for such objections.  The
     briefing requirements set forth in Local Rule 72.2 shall apply.
     A judge shall make a *de novo* determination of those portions of
     the report or specified proposed findings or recommendations to
     which objection is made and may accept, reject, or modify, in
     whole or in part, the findings or recommendations made by the
     magistrate judge.  The judge, however, need conduct a new
     hearing only in his or her discretion or where required by law,
     and may consider the record developed before the magistrate
     judge, making his or her own determination on the basis of that
     record.  The judge may also receive further evidence, recall
     witnesses or recommit the matter to the magistrate judge with
     instructions.